UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MASSACHUSETTS

C.A. No. 04-12039-WGY

WAYNE A. SCHERGER,                    *
d/b/a PROTECT PAINTERS               *
    *Plaintiff*,                    *
                                     *
v.                                   *
                                     *
SCOTT ESTABROOKS and                 *
JTC & COMPANY, INC.                  *
    *Defendants*                    *

## DEFENDANT JTC & COMPANY, INC.'S MOTION FOR LEAVE TO SUPPLEMENT MOTION FOR SUMMARY JUDGMENT

The defendant, JTC & Company, Inc. ("JTC"), through counsel, moves for leave to supplement its Summary Judgment Motion with excerpts from the plaintiff's Wayne A Scherger d/b/a ProTect Painter's ("ProTect") recent deposition (taken after JTC filed its Summary Judgment Motion). Leave should be granted because the plaintiff's deposition testimony will narrow the issues for the Court's review. To wit: (1) ProTect admitted that certain items in the mailer are not his original creation (and only original portions are entitled to copyright protection); (2) ProTect admitted that he does not claim copyright infringement of certain paragraphs; and (3) ProTect admitted that much of the language in the mailer contains conventional ideas and simple facts and that there is nothing special about the way ProTect expresses such items in his Mailer. JTC respectfully directs the Court's attention to the following testimony, which can be considered to be additional material facts pursuant to Local Rule 56.1 (copy of relevant pages attached as Exhibit A):

1

A.    **Admissions of Unoriginal Material.**

As this Court is surely aware, only original expressions are entitled to copyright protection.

1.    ProTect admitted that he got the idea of using a tear off card from a representative of a direct mail company. (p. 28, lns. 1-17, p. 40).

2.    ProTect copied the idea of having an information panel on the right hand side from an American Airlines mailer (pp. 29-30).

3.    ProTect also copied the "yes" checkmark in the tear-off from the American Airlines mailer (p. 30, lns. 4-16, p. 40).

4.    ProTect copied the post-it image on his mailer from a Turbo-Tax mailer (pp. 31-32, p. 40).

5.    ProTect admitted that he did not come up with the phrase of five-star service; General Motors used it as a line in their adds. (p. 41, ln. 34 – p. 42, ln. 15).[1]

6.    ProTect admits that putting a home improvement contractor's license on a mailer is required by law. (p. 48, lns. 6-12).

Thus, the information panel on the right, the post-it symbol, the tear off at the bottom, the use of a home improvement contractor's license number, and the phrase "five star service" should all be dissected from the substantial similarity analysis.

B.    **Admission of No Copying.**

ProTect's testimony greatly limits the portions of the Mailer to which he claims that JTC copied.

---

[1] As an aside, JTC's principal testified at his deposition that five stars are used in JTC's logo, which was created in 2002. The five stars represent a five-star general, which has a special meaning to JTC's principal because he coached football at both the Citadel and West Point.

7.    ProTect does not claim illegal copying of the tear-off at the bottom (p. 49, lns. 19-24).

8.    ProTect admits that JTC did not copy anything in the first bullet point, called "Dependable." (p. 58, lns. 16-24).

9.    ProTect admits that JTC did not copy anything in the third bullet point, called "Environmentally Friendly." (p. 65, lns. 1-6).

10.    ProTect admits that JTC did not copy anything in the last bullet point, "Full Service." (p. 69, ln. 17 – p. 70, ln. 4).

11.    ProTect does not allege that JTC copied the color of his brochure (p. 70, lns. 19-21).

12.    ProTect could not testify that JTC used the same font (although he complains that JTC italicized certain things as ProTect did) (p. 51, lns. 1-21).

Accordingly, the first, third and last bullet point should be dissected from the analysis, as should the color and font. As set forth above, the right panel, the post-it and the tear off should also be removed from the analysis. Thus, in the light most favorable to the Plaintiff, the only information that the Court could analyze for copyright violation appears in the opening paragraph, the second bullet point labeled "Quality," the fourth bullet point called "Full Service," and a few two-word phrases in the right panel. As set forth below and in the Memorandum, the Plaintiff's claim must fail because the information that Plaintiff seeks to protect is merely short phrases, conventional ideas and simple facts.

**C.    Admissions of Unoriginal, Conventional Ideas and Simple Facts.**

As set forth in the Memorandum and the case law cited by the parties, conventional ideas that lack creative spark, simple facts, and short phrases are not entitled to copyright protection.

Opening Paragraph

13.    Of the items that he alleges were copied in the opening paragraph [portions of the second and third sentence, but not the first], ProTect admits that there is nothing special about his language (p. 55-58), and that he is just conveying facts [which are not copyrightable].

14.    ProTect complains about the "five star service," phrase in the last line, but admits he copied it from someone else. (p. 42).

Language in Box on Right Side of Mailer

15.    ProTect has two complaints about the language within the box on the right – the "Local References" phrase and the "Fully Insured" phrase.  ProTect admitted, however, that he was not the first service business to use these phrases. (p. 51, ln. 22 – p. 52, ln. 17).

16.    He also complains that JTC put the words "Free estimate" in the same location, but admits that he did not come up with the idea to convey that a company would give a free estimate. (p. 53, lns. 4-12).

17.    ProTect admitted that it is not novel and is in fact common to offer to customers in a mailer a free estimate (p. 35, ln. 12 – p. 36, ln. 4).

Quality Bullet Point

18.    ProTect admitted that it is also not novel in the direct mail industry for service professionals to promise to "oversee every aspect of the job from start to finish." (p. 36, lns. 5-18).

19.    ProTect admits that there is nothing original or special about the phrase in his mailer, "Our crews are experienced, well-trained professionals who know that quality comes first." (p. 60, ln 20 – p. 61, ln. 14).

20.    ProTect admits that there is nothing special about the way his Mailer describes ProTect as being swift and professional (p. 67, lns. 14-17).

21.    ProTect complains that JTC "paraphrased" the last sentence, but does not allege direct copying (p. 68, lns. 8-14).

CONCLUSION

WHEREFORE, after dissecting the original portions and addressing only the alleged copied portions, it is apparent that the two mailers are not nearly identical.  Thus, the Defendant JTC & Company, Inc. requests that this Court award summary judgment in its favor as to Count II and order the plaintiff to pay JTC's attorneys' fees and costs.

VERIFICATION OF EXHIBIT

I, Adam P. Whitney, swear and depose that Exhibit A is a true copy of selected pages of the transcript from the Plaintiff's May 9, 2005 deposition.

JTC & COMPANY, INC.,

*By its attorneys,*

MORISI & OATWAY, P.C.

/s/ Adam P. Whitney
Andrew C. Oatway BBO #561885
Adam P. Whitney BBO #637777
MORISI & OATWAY, P.C.
1400 Hancock Street, Third Floor
Quincy, MA 02169-5203
Tel: (617) 479-0400
Fax: (617) 479-6885

**LOCAL RULE 7.2 CERTIFICATION**

I, Adam P. Whitney, Esq., counsel for Defendant JTC & Company, Inc., hereby certify that on May 16, 2005, at approximately 10:00 a.m., I faxed Cheri L. Crow, Esq., counsel for the Plaintiff, a letter explaining the need to immediately file this Motion and requested that she call me in a good faith effort to narrow or resolve the within Motion.

/s/ Adam P. Whitney

**CERTIFICATE OF SERVICE**

I hereby certify on this day that a true copy of the within document was served upon the attorney of record for each party by US Mail.

Date: 5/16/05          /s/ Adam P. Whitney

1

```
                    VOLUME:  I
                    PAGES:  175
                    EXHIBITS: See Index

          UNITED STATES DISTRICT COURT FOR
        THE EASTERN DISTRICT OF MASSACHUSETTS
            CIVIL ACTION NO. 04-12039-WGY


        ------------------------------
        WAYNE A. SCHERGER,            x
        d/b/a PROTECT PAINTERS,       x
              Plaintiff               x
                                      x
                 vs.                  x
                                      x
        SCOTT ESTABROOKS and          x
        JTC & COMPANY, INC.,          x
              Defendants              x
        ------------------------------


          DEPOSITION of WAYNE A. SCHERGER, taken
        pursuant to the applicable provisions of the
        Federal Rules of Civil Procedure, before
        Jill Kourafas, Certified Shorthand Reporter
        and Notary Public in and for the
        Commonwealth of Massachusetts held at the
        Law Offices of Morisi & Oatway, P.C.,
        1400 Hancock Street, Quincy, Massachusetts
        on May 9, 2005, commencing at Noon.



          ------------------------------
               REPORTERS, INC.
        GENERAL & TECHNICAL COURT REPORTING
        23 MERRYMOUNT ROAD, QUINCY, MA 02169
        617.786.7783/FACSIMILE 617.786.7723
```

---

2

```
 1              APPEARANCES OF COUNSEL:

 2
        For the Defendant:
 3         MORISI & OATWAY, P.C.
           (BY:  ADAM WHITNEY, ESQUIRE)
 4         1400 Hancock Street, 3rd Floor
           Quincy, Massachusetts 02169
 5
        For the Plaintiff:
 6         (BY:  CHERI CROW, ESQUIRE)
 7         23 Walkers Brook Drive
           Reading, Massachusetts 01867
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

3

**INDEX**

| Testimony of: | Page |
|---|---|
| Wayne A. Scherger<br>Examination by Mr. Whitney | 6 |

**INDEX OF EXHIBITS**

| Exhibits | Description | Page |
|---|---|---|
| 1 | ProTech Painters Mailer | 21 |
| 2 | American Airlines Mailer | 29 |
| 3 | TurboTax Mailer | 30 |
| 4 | Certa ProPainters Mailer | 33 |
| 5 | Certification of Registration | 43 |
| 6 | JTC Mailer | 48 |
| 7 | Plaintiff's Responses to Defendant JTC & Company, Inc.'s First Set of Interrogatories | 118 |
| 8 | ProTech Painters Mailer | 152 |
| 9 | ProTech Painters Mailer | 153 |
| 10 | ProTech Painters Mailer | 154 |
| 11 | ProTech Painters Mailer | 157 |
| 12 | ProTech Painters Mailer | 158 |

---

4

**INDEX OF EXHIBITS**

| Exhibits | Description | Page |
|---|---|---|
| 13 | American Painting Company Mailer | 158 |
| 14 | College Pro Painters Mailer | 159 |
| 15 | College Pro Painters Mailer | 161 |
| 16 | Certa ProPainters Mailer | 161 |
| 17 | Tom Curren Mailer | 164 |
| 18 | Prep-Rite Mailer | 164 |
| 19 | College Pro Painters Direct Mailer | 166 |
| 20 | ProTech Painters Mailer | 168 |
| 21 | ProTech Painters Mailer | 169 |
| 22 | Document titled Just a Remainder from ProTech Painters | 169 |

25

| | | |
|---|---|---|
| 1 | A. | **Amy Strauch.** |
| 2 | Q. | How do you spell her last name? |
| 3 | A. | **S-T-R-A-U-C-H.** |
| 4 | Q. | When is the last time you have talked to |
| 5 | | Ms. Strauch? |
| 6 | A. | **This past week.** |
| 7 | Q. | What was the occasion for you to speak with |
| 8 | | her? |
| 9 | A. | **She works on other mailing materials for us.** |
| 10 | Q. | Is she an employee of -- |
| 11 | A. | **No, she's not.** |
| 12 | Q. | Who is she employed by? |
| 13 | A. | **She runs her own graphics business.** |
| 14 | Q. | Have you spoken to her about this lawsuit? |
| 15 | A. | **Yes.** |
| 16 | Q. | Tell me about that conversation. |
| 17 | A. | **We spoke that she may be called or deposed** |
| 18 | | **on creation of marketing materials for** |
| 19 | | **ProTech Painters.** |
| 20 | Q. | Did she have anything to say about that? |
| 21 | A. | **No.** |
| 22 | Q. | Was that the entire conversation? |
| 23 | A. | **At that time.** |
| 24 | Q. | Did you have another conversation with her |

26

| | | |
|---|---|---|
| 1 | | about this lawsuit? |
| 2 | A. | **No.** |
| 3 | Q. | Have you asked her for an affidavit? |
| 4 | A. | **No.** |
| 5 | Q. | Now, what was Ms. Strauch's suggestions for |
| 6 | | the layout for that mailer? |
| 7 | A. | **Which year's mailer are you talking about?** |
| 8 | Q. | Well, any mailer -- let's first look at |
| 9 | | Exhibit 1. |
| 10 | | Is there anything on here that you |
| 11 | | can point to where Ms. Strauch played a |
| 12 | | role? |
| 13 | A. | **No, on this particular layout.** |
| 14 | Q. | The answer is "no" *on* that particular |
| 15 | | layout? |
| 16 | A. | **That's correct.** |
| 17 | Q. | She played a role in prior layouts, maybe as |
| 18 | | far back as 1995? |
| 19 | A. | **That's correct.** |
| 20 | Q. | Do you know what exact role she played in |
| 21 | | the layout? |
| 22 | A. | **She's created most of our materials,** |
| 23 | | **business kit, brochures in prior years.** |
| 24 | Q. | I'm talking about the precursor to |

27

| | | |
|---|---|---|
| 1 | | Exhibit No. 1. |
| 2 | A. | **(Referring to Attorney Crow) Can we pull** |
| 3 | | **out --** |
| 4 | | MS. CROW: Ask him. |
| 5 | A. | **We have a copy of that if you would like to** |
| 6 | | **see it.** |
| 7 | Q. | Are you telling me you can't answer without |
| 8 | | seeing it? |
| 9 | A. | **I'm giving it to you for you to see it.** |
| 10 | | MS. CROW: No. Why don't you |
| 11 | | answer his question then. |
| 12 | A. | **Well, rephrase the your question.** |
| 13 | Q. | My question is: Can you tell me without |
| 14 | | seeing the prior precursor to Exhibit No. 1 |
| 15 | | what parts that Ms. Strauch played in |
| 16 | | explaining the layout for you, or helping |
| 17 | | you with the layout, or would you need that |
| 18 | | in front of you to -- |
| 19 | A. | **No, I can answer the question.** |
| 20 | Q. | Okay. |
| 21 | A. | **She would lay it out based on knowing that** |
| 22 | | **certain white space is required, spacing for** |
| 23 | | **wording, what colors you may want to use for** |
| 24 | | **stars or boldfaced items.** |

28

| | | |
|---|---|---|
| 1 | Q. | You also mentioned someone at the direct |
| 2 | | mail place helped you with the layout? |
| 3 | A. | **Yes.** |
| 4 | Q. | Who was that? |
| 5 | A. | **Ralph Dumican.** |
| 6 | Q. | What role did he play in laying out Exhibit |
| 7 | | No. 1? |
| 8 | A. | **He played a much greater role in this layout** |
| 9 | | **than Amy Strauch.** |
| 10 | | Not to be difficult with your last |
| 11 | | answer, Ralph Dumican helped design this |
| 12 | | piece more than -- |
| 13 | Q. | What did Ralph suggest that appears in this |
| 14 | | final version Exhibit 1? |
| 15 | A. | **That we use a tear-off business reply card,** |
| 16 | | **suggested a legal size versus letter size.** |
| 17 | | **This happens to be a reduced version.** |
| 18 | Q. | Understood. |
| 19 | A. | **Suggested we use a No. 9 business reply mail** |
| 20 | | **envelope, suggested this mail is sent off in** |
| 21 | | **a No. 10 window envelope.** |
| 22 | Q. | Anything else that Ralph suggested? |
| 23 | A. | **No.** |
| 24 | Q. | What did you rely on, if anything, to create |

1     Exhibit 1?
2 A. **We used our previous mailing copy, and I**
3     **relied on the American Airlines direct mail**
4     **piece as a guide.**
5
6     *(Exhibit No. 2, American Airlines*
7     *Mailer, marked for identification)*
8
9 Q. Mr. Scherger, I am going to hand you what is
10     Exhibit 2, which is a document produced to
11     me by your counsel.
12     You'll notice in the bates-numbers
13     near the bottom this particular one is
14     numbered 000003 through 4.  Those I had my
15     office put on for identification purposes.
16     I'll hand you Exhibit 2.  Is that a
17     copy of the American Airlines flyer that you
18     were referring to?
19 A. **That's correct.**
20     MS. CROW:  That's the back side.
21 Q. The second page is the back side?
22 A. **That's correct.**
23 Q. This is something that was mailed to your
24     home in Georgia?

1 Q. second, Exhibit No. 2 has a tear-off card on
2     the bottom?
3 A. **That's correct.**
4 Q. Did you get your idea for a tear-off card at
5     the bottom of Exhibit No. 1 from the
6     American Airlines flyer?
7 A. **No.**
8 Q. Where did you get the idea for a tear-off
9     card?
10 A. **Ralph Dumican in 1995.**
11 Q. I show you what we've marked as Exhibit 3,
12     which is a document produced by your counsel
13     bates-numbers 000001 through 2.
14 A. **(Witness reviews document.)**
15 Q. Do you recognize that document?
16 A. **Yes.**
17 Q. What is that?
18 A. **It is a direct mail piece from TurboTax.**
19 Q. Is this something that you received?
20 A. **No.**
21 Q. Who is William Dewey?
22 A. **A friend of the family.**
23 Q. Did he provide a copy of this to you?
24 A. **Yes.**

1 A. **That's correct.**
2 Q. And when did you receive this?
3 A. **I believe in 1999, spring 1999.**
4 Q. So what ideas, if any, did you take from
5     Exhibit 2 to create Exhibit 1, your
6     brochure?
7 A. **The panel down the right side.**
8 Q. Anything else?
9 A. **The "yes" checkmark.  Nothing else.**
10 Q. The "yes" checkmark --
11 A. **And the business reply tear-off.**
12 Q. Near the bottom on the left-hand side?
13 A. **That's correct.**
14 Q. So, those two things you took the idea from
15     Exhibit 2?
16 A. **Yes.**
17 Q. Anything else you relied on to create
18     Exhibit No. 1?
19 A. **No.**
20
21     *(Exhibit No. 3, TurboTax Mailer,*
22     *marked for identification.)*
23
24 Q. Getting back to Exhibit No. 2 for one

1 Q. When was that?
2 A. **1998.**
3 Q. Did you take any ideas from Exhibit No. 3 to
4     create Exhibit No. 1 your brochure?
5     MS. CROW:  Mailer.
6 Q. Your mailer; I'm sorry.
7 A. **There's a Post-It image on the TurboTax.  On**
8     **the original it's grayed, and we used a pink**
9     **Post-It on our piece.**
10 Q. And in your piece, it is on the top
11     right-hand side?
12 A. **Yes.**
13 Q. And that states "Here *is your opportunity to*
14     *receive a free estimate for all your*
15     *painting needs"*?
16 A. **Yes.**
17 Q. You got the idea for the Post-It from
18     Exhibit No. 3?
19 A. **That's correct.**
20 Q. Anything else you took from Exhibit 3 that
21     helped you create Exhibit No. 1?
22 A. **Nope.**
23 Q. To create Exhibit No. 1, did you take any
24     ideas from any mailers from Certa Pro?

33

1  A.  **No.**

2

3         *(Exhibit No. 4, Certa ProPainters*
4  *Mailer, marked for identification.)*

5

6  Q.  Mr. Scherger, I'll hand you what has been
7      marked as Exhibit No. 4, also a document
8      produced by your counsel.  I believe it is
9      No. 25 at the bottom.
10         Mr. Scherger, do you recognize
11     Exhibit No. 4?
12 A.  **Yes.**
13 Q.  What do you recognize that to be?
14 A.  **Certa ProPainters direct mail piece.**
15 Q.  How did you come into possession of that
16     document?
17 A.  **A friend of the family provided it to me.**
18 Q.  When was that?
19 A.  **This piece is spring 2005.**
20 Q.  Do you know if there are any previous
21     versions of Certa ProPainters mailers prior
22     to 2005?
23 A.  **Yes, there is.**
24 Q.  What other ones are you aware of?  How far

34

1      do they go back?
2  A.  **1994, I believe.**
3  Q.  Are you familiar with the former Certa
4      ProPainters mailers?
5  A.  **Yes.**
6  Q.  Did you have any role in creating any of
7      them?
8  A.  **Yes.**
9  Q.  Were there any that were produced by Certa
10     ProPainters while you were there that were
11     created by anyone else?
12 A.  **I don't understand your question.**
13 Q.  Okay, well, during the time that you were at
14     Certa ProPainters, there were some mailers
15     that were created by them that they sent
16     out to potential customers; is that correct?
17 A.  **That's correct.**
18 Q.  And did you create all of the ones for Certa
19     ProPainters while you were there or was
20     there only one mailer?
21 A.  **Various mailers.**
22 Q.  Did anyone else play a role in creating
23     those while you were at Certa ProPainters?
24 A.  **Yes.**

35

1  Q.  Who else played a role?
2  A.  **Tom Wood.  That would be the only name I**
3      **could recall.**
4  Q.  Looking at Exhibit No. 4, is there anything
5      on there that was part of your creation that
6      remains in the 2005 mailer?
7  A.  **No.**
8  Q.  Do you have any reason to believe that Certa
9      ProPainters copied anything from ProTech
10     Painters mailers?
11 A.  **No.**
12 Q.  You notice under one of the bullet points
13     Certa ProPainters guarantees under that --
14     it says *"We'll be on time every time."*
15 A.  **I see it.**
16 Q.  Does that strike you as something that is
17     novel for painting mailers?
18 A.  **I don't consider it novel.  It is fairly**
19     **popular in the contracting and direct mail**
20     **pieces.**
21 Q.  It's popular to say that you'll be on time
22     every time, something to that effect?
23 A.  **It's fairly common in a direct mail piece.**
24 Q.  What about the next bullet point under that,

36

1      *"You'll receive a detailed written estimate*
2      *at the time of your appointment,"* is that
3      something common in direct mail pieces?
4  A.  **That's correct.**
5  Q.  Two paragraphs above that it starts, *"Your*
6      *project will be managed by a professional*
7      *job site supervisor, who will oversee every*
8      *aspect of the job from start to finish."*
9          Is that a novel concept saying that
10     someone will oversee the job from start to
11     finish?
12 A.  **No.**
13 Q.  Is that something you think is common in the
14     direct mailing industry for service
15     professionals?
16 A.  **There are some variations of that.  I think**
17     **this piece has -- that particular line is**
18     **not as common.**
19 Q.  Getting back to Exhibit 1, other than the
20     people you've told me about, is there anyone
21     else that played a role in creating Exhibit
22     No. 1 or any precursor to it?
23 A.  **Other than the people mentioned?**
24 Q.  Right.

| | |
|---|---|
| 1 A. | **No.** |
| 2 Q. | Is there anything else you relied on to |
| 3 | create Exhibit No. 1 or precursors other |
| 4 | than what you've told me about? |
| 5 A. | **No.** |
| 6 Q. | So how did you physically create the first |
| 7 | precursor to Exhibit No. 1? |
| 8 | Did you type it yourself on a |
| 9 | computer?  Tell me how that happened. |
| 10 A. | **Yes.** |
| 11 Q. | You typed it on a computer? |
| 12 A. | **Yes.** |
| 13 Q. | Do you remember what program you used? |
| 14 A. | **WordPerfect** |
| 15 Q. | Where were you when that was happening? |
| 16 A. | **Cambridge.** |
| 17 Q. | Did you have an office there or was that out |
| 18 | of your house? |
| 19 A. | **I had an office in Needham at the time.  I** |
| 20 | **recall -- I can't give you the exact** |
| 21 | **location, if it was Needham or Cambridge** |
| 22 | **as to the place I had a computer keying it** |
| 23 | **in.** |
| 24 Q. | But you were at your office? |

| | |
|---|---|
| 1 | out at that time? |
| 2 A. | **Yes.** |
| 3 Q. | Between the time that you sat at your |
| 4 | computer and wrote it and you took it to |
| 5 | Mail America, did anyone else assist you in |
| 6 | the mailer in any way, the original version? |
| 7 A. | **No.** |
| 8 Q. | How did Ms. Strauch become involved?  Was |
| 9 | that a later version? |
| 10 A. | **She provided us with the star and typeface.** |
| 11 | **We used Futura Bold Italic as our logo and** |
| 12 | **the stars and --** |
| 13 Q. | Did she come up with the ideas of using |
| 14 | stars or just the typeface for the |
| 15 | stars? |
| 16 A. | **Typeface.** |
| 17 Q. | I'm sorry, what is the typeface for the |
| 18 | stars? |
| 19 A. | **Futura Bold Italic.** |
| 20 Q. | Is that something that's on WordPerfect? |
| 21 A. | **It is now.  It was not at the time.  You** |
| 22 | **needed to buy an additional font package.** |
| 23 Q. | Is that the same typeface that appears on |
| 24 | Exhibit No. 1? |

38

| | |
|---|---|
| 1 A. | **Yes.** |
| 2 Q. | Who else was there at the office at the |
| 3 | time?  Anyone? |
| 4 A. | **No.** |
| 5 Q. | How many people were stationed at the office |
| 6 | at the time? |
| 7 A. | **Zero.** |
| 8 Q. | How many people used the office? |
| 9 A. | **Just myself.** |
| 10 Q. | What, if anything, did you have in front of |
| 11 | you when you created the first version of |
| 12 | Exhibit No. 1? |
| 13 A. | **Nothing.** |
| 14 Q. | You just created everything from your head? |
| 15 A. | **Yes.** |
| 16 Q. | Then what did you do with it after you first |
| 17 | created that original mailer in 1995? |
| 18 A. | **Presented it to Mail America.** |
| 19 Q. | Where is Mail America? |
| 20 A. | **They were located in Waltham, Massachusetts.** |
| 21 | **No longer in business.** |
| 22 Q. | Was there a contact person there? |
| 23 A. | **Ralph Dumican.** |
| 24 Q. | Did you cause the first version to be mailed |

40

| | |
|---|---|
| 1 A. | **Yes.** |
| 2 Q. | Do you allege that JTC uses the same |
| 3 | typeface? |
| 4 A. | **(P*ause.*)** |
| 5 Q. | Only if you know. |
| 6 A. | **Could I see the piece?** |
| 7 Q. | Without looking at it, do you know whether |
| 8 | JTC uses the same typeface for its stars? |
| 9 A. | **I don't know.** |
| 10 Q. | Getting back to Exhibit 1, we established |
| 11 | you took the idea for the block on the right |
| 12 | from American Airlines, correct? |
| 13 A. | **Yes.** |
| 14 Q. | You took the idea of the Post-It note on the |
| 15 | top right-hand corner from TurboTax correct? |
| 16 A. | **That's correct.** |
| 17 Q. | I'm sorry, and the idea of the "yes" *box* you |
| 18 | took from American Airlines; is that |
| 19 | correct? |
| 20 A. | **Yes.** |
| 21 Q. | And the idea of the tear-off at the bottom, |
| 22 | who came up with that idea? |
| 23 A. | **Ralph Dumican.** |
| 24 Q. | And do you know if he was the first one to |

41

1  come up with an idea of a tear-off on the
2  bottom of a mailer?
3  A.  **I have no reason to believe that he -- or**
4  **that it wasn't the first.**
5  Q.  You'd a never seen a tear-off return on a
6  mailer prior to that?
7  A.  **Not prior to 1995.**
8  Q.  Have you seen any since?
9  A.  **Many.**
10  Q.  Is that something that's common in the
11  service industry mailers?
12  A.  **It is common in direct mail pieces.**
13  Q.  So getting to the body of the mailer, if you
14  will, and I'm talking about the bullet
15  points, the heading after "*Dear Mr.*
16  *Hutchins*" and everything above "*Sincerely,*"
17  did you create all that language?
18  A.  **Yes.**
19  Q.  Did anyone assist you with it in any way?
20  A.  **No.**
21  Q.  Did anyone ever suggest any changes to the
22  language?
23  A.  **No.**
24  Q.  Who came up with the phrase "*Five star*

42

1  *service*"?
2  A.  **I did.**
3  Q.  How did you think of that?  Had you heard it
4  before?
5  A.  **I'd heard it before.**
6  Q.  Do you know in connection with what you
7  heard it before?
8  A.  **I think General Motors used to use it as a**
9  **line in their ads.  It fit with our five**
10  **stars of marketing bullets of our features**
11  **and benefits of what we wanted to project in**
12  **our piece.**
13  Q.  So you're not the first one that used the
14  phrase "*Five star service*"?
15  A.  **No.**
16  Q.  Is there anything original about the way you
17  used the phrase "*Five star service*"?
18  A.  **With the five bullets and five stars, that's**
19  **original.**
20  Q.  You think it is original because you have
21  five bullet points with stars that matches
22  up to "*Five star service*"?
23  A.  **And the copy that goes with it.**
24  Q.  What do you mean "an*d the copy that goes*

43

1  *with it*"?
2  A.  **The information that is with every bullet**
3  **point.**
4  MR. WHITNEY:  Let's mark that.
5
6  (*Exhibit No. 5, Certificate of*
7  *Registration, marked for identification.*)
8
9  Q.  I hand you what we've marked as Exhibit 5,
10  which is a copy of Exhibit No. 3 to your
11  complaint.
12  I'll ask you if you recognize that
13  document.
14  A.  **(Witness reviews document.)**
15  It's the first time I've seen it.
16  Q.  Do you know what that document is?
17  A.  **Yes.**
18  Q.  And what is your understanding of what it
19  is?
20  A.  **It is the registration of our direct mail**
21  **piece.**
22  I may have seen it prior, but I
23  don't recall, but I do understand what it
24  is.

44

1  Q.  Did you sign this document?
2  A.  **No.**
3  Q.  Is it signed by an attorney for you, one of
4  your attorneys?
5  A.  **Yes.**
6  Q.  What involvement did you have in the
7  process of registering the copyright without
8  telling me anything you said to your
9  attorney?
10  MS. CROW:  Yeah, I want to make it
11  clear to you I'm objecting insofar as that
12  calls for attorney/client privilege, so do
13  not convey communications between you and
14  any other attorney.
15  With that caveat, he's -- other
16  than that, is there anything -- and tell me
17  if I'm -- he's looking for anything that you
18  had to do with the registration of your
19  copyright.
20  MR. WHITNEY:  Correct.
21  A.  **No.**
22  Q.  You played no role in the registration other
23  than whatever your attorneys did?
24  A.  **That's correct.**

**45**

1  Q.  Did you receive anything back from the
2      copyright office regarding your
3      registration?
4  A.  **Not that I recall.**
5  Q.  Now, prior to May of 2003, what, if
6      anything, did you do to protect your
7      interest in your creation of Exhibit No. 1?
8  A.  **We did nothing.  I wasn't aware that I**
9      **needed to do anything.**
10         I thought our piece was original
11     and that it was covered under basic
12     copyright protection.
13 Q.  So, do you have an idea in your mind how
14     many copies of this you've sent out since
15     1996 when it was first sent out?
16 A.  **Including all versions?**
17 Q.  All versions.
18 A.  **Do you want to know an exact number?**
19 Q.  If you have it.
20 A.  **If you give me -- I wouldn't have an exact**
21     **number, but if you gave me a minute or two,**
22     **I could create a total.**
23 Q.  How would you create a total?  Tell me what
24     you would go through.

**46**

1  A.  **Look at all the drop schedules for all my**
2      **franchisees for the past years which would**
3      **give us an accurate number.**
4  Q.  What do you mean when you say "*drop*
5      *schedules*"?
6  A.  **In the springtime, we start our direct mail**
7      **program, we pick certain dates, generally**
8      **starting in March, every two weeks, and**
9      **we'll drop mail into certain demographic**
10     **areas.**
11        The average franchisee will mail
12     25,000 pieces, some more, some less, over
13     the course of the year generally hitting
14     each zip code or customer base twice in our
15     target area.
16 Q.  There's 25,000 a year per franchisee, more
17     or less?
18 A.  **Approximate number.  There would be some**
19     **more, some less.  Some 20,000.  Some 40,000.**
20 Q.  You sent out your -- you or your franchisees
21     have sent out hundreds of thousands of these
22     things; is that fair to say?
23 A.  **That's correct.**
24 Q.  Have you ever transferred any rights to

**47**

1      Exhibit No. 1, given any licenses allowing
2      anyone to use it?
3  A.  **No.**
4  Q.  Other than, I guess, your franchisees?
5  A.  **No.  Including franchisees, who would have a**
6      **right if they presented me something they**
7      **wanted to send off, that I would proof it.**
8      **But nobody has ever had a license to mail**
9      **everything.**
10 Q.  But you allowed your franchisees to send out
11     copies of Exhibit No. 1?
12 A.  **That's correct.**
13 Q.  Is that under a written agreement?
14 A.  **Yes.**
15 Q.  Other than your franchisees, have you ever
16     let anyone else use Exhibit No. 1?
17 A.  **No.**
18 Q.  Now, it's your allegation that JTC copied
19     Exhibit No. 1?
20 A.  **Yes.**
21 Q.  How do you come to that conclusion?
22 A.  **Layout is very similar, copy is very**
23     **similar, the No. 10 envelope with Post-It is**
24     **very similar.  The bullet points are very**

**48**

1      similar, that the Mass. home improvement
2      contractors number is where it's at is very
3      similar.
4  Q.  Anything else?
5  A.  **Other than copy, layout and text, no.**
6  Q.  Why do you put the home improvement
7      contractors license number on your mailer?
8  A.  **If you were a home improvement contractor,**
9      **you need to have a home improvement**
10     **contractors license number.**
11 Q.  It is required by law?
12 A.  **Yes.**
13 Q.  Is it required by law to put the number on
14     the mailer, do you know?
15 A.  **I don't know.**
16 Q.  Do you do that to try to comply with laws?
17 A.  **Yes.**
18
19         (*Exhibit No. 6, JTC Mailer, marked*
20     *for identification.*)
21
22 Q.  I hand you a copy of Exhibit 6 which was
23     Exhibit No. 4 to your complaint.  Again,
24     it's a black-and-white copy in a reduced

49

1   size 8-and-a-half-by-11.

2       Do you recognize that to be JTC's

3   mailer of which you complain in this

4   lawsuit?

5   A.   **Yes.**

6   Q.   Now, you allege that the layout is similar;

7   is that your allegation, or the same?

8   What's your allegation regarding the layout?

9   A.   **Very similar.**

10  Q.   You say that because for one thing they --

11  there's this box on the right side; is that

12  one of your allegations regarding the

13  layout?

14  A.   **It's one of them.**

15  Q.   But that's not something that you created,

16  the box on the right side, you got that idea

17  from American Airlines?

18  A.   **Correct.**

19  Q.   Something else about the layout, is it the

20  tear-off at the bottom?

21  A.   **No.**

22  Q.   That's not something you're alleging as

23  being similar?

24  A.   **No.**

50

1   Q.   What else about the layout do you allege?

2   A.   **Five stars.**

3   Q.   Okay.

4   A.   **The minimum of three bullets and very**

5   **similar wording.**

6   Q.   I'm not talking about the wording, just the

7   layout.

8   A.   **Five stars down the left side.**

9   Q.   What do you mean by "the *minimum of three*

10  *bullets*"?

11  A.   **"Quality, clean and courteous, full**

12  **service."**

13  Q.   Other than the language, what about the

14  layout do you allege is similar other than

15  the stars on the left side and the box on

16  the right side; anything else?

17  A.   **Five stars in the box on the right side.**

18  ***"Call today for a free estimate"* on the**

19  **right side.  Home improvement contractors**

20  **license number.  Positioning of the phone**

21  **number on the bottom of the right side.  In**

22  **italics font.**

23  Q.   What italics font are you referring to?

24  A.   **The five stars.**

51

1   Q.   You believe that JTC's font on the five

2   stars is italicized?

3   A.   **That's an italicized font.**

4   Q.   How do you know that?

5   A.   **It slants to the right, it's an italicized**

6   **font.**

7   Q.   Is it a different font than you used on your

8   mailers, Exhibit No. 1?

9   A.   **(Pause.)**

10  Q.   If you would like to look at the color

11  copies that your attorney brought, you're

12  welcome to do that.

13  A.   **Can I see that?**

14      *(Attorney Crow complies.)*

15  A.   **(Witness reviews document.)**

16      Very similar font.

17  Q.   Do you know what font JTC is using there?

18  A.   **I don't know what font that is.**

19      It could be a version of Futura,

20  Futurist, Futuro, which are all fonts in the

21  Futura family.

22  Q.   Looking at what's in the box on the

23  right-hand side of your brochure -- I'm

24  sorry, your mailer, Exhibit No. 1, in the

52

1   right-hand side, and comparing that to the

2   right-hand side of JTC's mailer, Exhibit

3   No. 6, the words aren't the same, are

4   they?

5   A.   **"Local references" are.**

6   Q.   "Local references" is repeated?

7   A.   **That's correct.**

8   Q.   Did you come up with the idea of "local

9   references"?

10  A.   **Yes.**

11  Q.   Is that a novel idea given local references?

12  A.   **If you're trying to solicit business,**

13  **customers prefer to see local references.**

14  Q.   Right, but are you the first one to ever

15  come up with that concept for direct mailers

16  for service businesses?

17  A.   **No.**

18  Q.   What else is repeated in the box on the

19  right-hand side, anything else?

20  A.   **Repeated exactly in bullets.  We just talked**

21  **about *"fully insured."*  Oh, yup, *"fully**

22  **insured."*  My mistake, sorry.**

23  Q.   Both say "fully insured"; and did you come

24  up with the idea of being fully insured or

53

1  conveying that, that you're fully insured?
2  A.  **I came up with the idea. I'm probably not**
3     **the very first person that's written it.**
4  Q.  What else, if anything, is copied in the box
5     on the right-hand side?
6  A.  **Location of the phone number.**
7  Q.  Anything else?
8  A.  **Request for a free estimate today, same**
9     **location.**
10 Q.  Did you come up with the idea of giving a
11    free estimate?
12 A.  **No.**
13 Q.  But your complaint is that it's in the same
14    location?
15 A.  **Yes.**
16 Q.  Anything else in the box that's the same?
17 A.  **No.**
18 Q.  Now, your first bullet point in the box is
19    *"competitive prices"*; is that correct?
20 A.  **That's correct.**
21 Q.  Does JTC have anything that says
22    *"competitive prices"* on their box on the
23    right-hand side?
24 A.  **No.**

54

1  Q.  You have *"detailed estimates"* as your second
2     bullet point. Does JTC says *"detailed*
3     *estimates"*?
4  A.  **No.**
5  Q.  So there's two difference.
6        *"Local references"* is the same;
7     your fourth one *"top quality materials,"*
8     does JTC say that in its mailer?
9  A.  **No.**
10       MS. CROW: You mean on the
11    right-hand side?
12       MR. WHITNEY: On the right-hand
13    side.
14 A.  **No, not on the right-hand side.**
15 Q.  And on its mailer JTC doesn't have the -- on
16    the mailer itself, it doesn't have the
17    Post-It note on the top, correct?
18 A.  **That's correct.**
19 Q.  But your complaint is that it's on the
20    envelope?
21 A.  **That's correct.**
22 Q.  Do you know if you included the envelope
23    as part of the complaint to the Federal
24    Court?

55

1  A.  **I don't know.**
2  Q.  Back to your mailer, Exhibit No. 1, you have
3     a heading thereafter the *"Dear Mr...."*
4  A.  **"Dear Mr. Hutchins."**
5  Q.  It says, *"ProTech Painters is the answer to*
6     *all of your painting needs."* JTC doesn't
7     copy that line, does it?
8        MS. CROW: Objection.
9        Just for the record, I'm not gonna
10    stop you from doing this line of
11    questioning, but the documents speak for
12    themselves as to what they do and don't say
13    and where they say it.
14       So, I just -- you know, I just --
15    you know, what my client specifically
16    notices at this particular time doesn't
17    change what documents do or don't do.
18       With that caveat, continue.
19 Q.  Do you need me to repeat that question?
20 A.  **No.**
21       No, it doesn't say it.
22 Q.  So you don't know allege JTC copied that
23    first line, do you?
24 A.  **No.**

56

1  Q.  Do you allege JTC copied the second line,
2     *"We have become one of the largest painting*
3     *and decorating companies because we have the*
4     *experience to handle all of your*
5     *requirements no matter how large or small"?*
6  A.  **The two lines on -- the second and third**
7     **line on the JTC piece are very similar to**
8     **the second line on our piece.**
9  Q.  So their two sentences are very similar, in
10    your opinion, to the second sentence on your
11    piece?
12 A.  **Yes.**
13 Q.  On your mailer?
14 A.  **Yes.**
15 Q.  What parts of it do you think are very
16    similar?
17 A.  **"Largest painting and decorating company.**
18    **Experience to handle all of your interior**
19    **and exterior painting no matter how large or**
20    **small."**
21 Q.  Did you come up with the idea saying that
22    ProTech is a large painting and decorating
23    company?
24 A.  **Yes.**

57

1  Q.  What's special about the way that you say
2      that?  Anything?
3  A.  **I don't understand your question.**
4  Q.  Well, isn't JTC also a large painting and
5      decorating company?
6  A.  **Not to my knowledge.**
7  Q.  Well, if they were, would they be allowed to
8      say it?
9  A.  **If they were.**
10 Q.  So is there anything special about the way
11     you say *"largest painting and decorating*
12     *company"* or is that just an idea that
13     ProTech is one of the largest painting and
14     decorating companies?
15 A.  **Based on volume of business.**
16 Q.  Right; but what I'm asking you is:  Is there
17     anything special about the way you express
18     that fact?
19 A.  **No.**
20 Q.  Is there anything special about the way you
21     say that *"ProTech has experience to handle*
22     *all of the customers' requirements no matter*
23     *how large or small"*?
24 A.  **No.**

58

1  Q.  Isn't that just an idea?
2  A.  **It's a fact.**
3  Q.  In your last sentence *"Our five star service*
4      *is not just our slogan but the way we*
5      *approach every job."*  And JTC says, *"Our*
6      *five star service is guaranteed,"* do you
7      think JTC copied that last line?
8  A.  **A portion of it.**
9  Q.  But you copied the idea of *"five star*
10     *service"* from somebody else; is that
11     correct?
12 A.  **I heard that phrase before.**
13 Q.  Let's go to your first -- you call it a
14     bullet point?
15 A.  **Right.**
16 Q.  Your first bullet point is labeled
17     *"dependable"*; is that correct?
18 A.  **That's correct.**
19 Q.  And JTC doesn't have a bullet point called
20     *"dependable"*; is that correct?
21 A.  **No, they don't.**
22 Q.  Do you allege that JTC copied anything under
23     the heading of *"dependable"*?
24 A.  **No.**

59

1  Q.  Your second bullet point is *"qua*lity," do
2      you allege JTC copied that bullet point?
3  A.  **Very similar language.**
4  Q.  Are you talking about JTC's bullet point,
5      the third one down?
6  A.  **Well, we'll get to that one in a second.**
7      **There is language that could be**
8      **construed from the *"experience"* bullet that**
9      **would lead them to believe that -- lead us**
10     **to believe that it is similar to our overall**
11     **information.**
12 Q.  Okay, you're talking about the second bullet
13     point for JTC?
14 A.  **Yeah.**
15 Q.  What in that bullet point do you take as
16     being copied, if anything, from the ProTech
17     Painters' mailer?
18 A.  **It's not copied, but using the language**
19     **specializes and identifying themselves and**
20     **the cause of painting problems is**
21     **paraphrased from brands of paint and tools**
22     **to make the job last, which is copied in**
23     **the *"quality"* bullet number three on JTC's**
24     **piece.**

60

1  Q.  Is there anything under JTC's bullet point
2      of *"experience"* that's --
3  A.  **A direct copy?  No.**
4  Q.  Is there anything in there that copies any
5      phrases in your mailer?
6  A.  **No.**
7  Q.  You also reference bullet point -- the third
8      bullet point down for JTC?
9  A.  **Yes.**
10 Q.  Do you believe anything in there is copied
11     from the ProTech Painters' mailer?
12 A.  **The first sentence.**
13 Q.  *"Our crews are experienced painting*
14     *professionals who understand that quality*
15     *comes first."*
16     Are you referring to your first
17     sentence under you second bullet point
18     *"quality"*?
19 A.  **Yes.**
20 Q.  You state there *"Our crews are experienced,*
21     *well-trained professionals who know that*
22     *quality comes first."*
23     *"Quality comes first,"* is that a
24     phrase you invented?

**Page 61**

1   A.   **No.**

2   Q.   Is there any particular word or phrase in

3        here that's original in that sentence I just

4        read?

5   A.   **No.**

6   Q.   Is there anything special about the way you

7        say it?

8   A.   **Nothing special about the way I say it.**

9   Q.   When I say "the *way you say it*," I meant the

10       way it is written in Exhibit No. 1?

11  A.   **I understand.  The only difference is that**

12       **they use "*painting professionals.*"  We use**

13       **"*well-trained professionals.*"  Other than**

14       **that, it is a copy.**

15  Q.   Again, is that a fact that your crews are

16       experienced, well-trained professionals?

17  A.   **Yeah.**

18  Q.   It says here "We *use only top brand of paint*

19       *and tools to make your job last,*" what top

20       brands of paint do you use?

21  A.   **Sherwin Williams, Benjamin Moore, Hancock**

22       **Paint.**

23  Q.   Are those the only ones that are used?

24  A.   **Pratt & Lambert, Duron.**

**Page 62**

1             I could give you a long list of

2   products but only their top line of product

3   is ones we use.

4   Q.   Now, does JTC copy that sentence "We *use*

5        *only top brands of paint and tools to make*

6        *your job last*"?

7   A.   **The wording is strikingly similar.**

8   Q.   Is using top brands of paint or saying they

9        are using top brands of paint, is that a

10       novel concept for the paining industry?

11  A.   **In a direct mail piece it is.**

12  Q.   You're the first ever one to say that?

13  A.   **As far as I know.**

14  Q.   Are you the first one to ever make the

15       connection that top brands of paint make

16       your job last?

17  A.   **I would say yes.**

18  Q.   Is there anything special about the way you

19       express that idea in Exhibit No. 1?

20  A.   **Nothing special about it.  It is not bolded**

21       **or italicized.**

22  Q.   Well, your last sentence under the "qu*ality*"

23       heading, Exhibit 1, "*The greatest proof of*

24       *this is our list of satisfied customers,*" do

**Page 63**

1        you allege that JTC copied that line?

2   A.   **No.**

3   Q.   Your next bullet point "en*vironmentally*

4        *friendly*"?

5   A.   **Correct.**

6   Q.   How is ProTech Painters environmentally

7        friendly?

8   A.   **We use only nontoxic products.  If we happen**

9        **to use a product that can create a hazardous**

10       **waste product, we dispose of it correctly.**

11  Q.   Anything else?

12  A.   **And following that program we help to**

13       **preserve the environment.**

14  Q.   Is that something that's unique to ProTech

15       in the painting industry?

16  A.   **That it is written, yes.**

17  Q.   Do other painting companies follow the same

18       procedures, if you know?

19  A.   **If they are compliant.**

20  Q.   So by being "en*vironmentally friendly,*" tha*t*

21       just means you're complying with existing

22       laws?

23  A.   **Yes.  It's a unique line in a direct mail**

24       **piece.**

**Page 64**

1   Q.   Do you think that it implies ProTech is more

2        environmentally friendly than other painting

3        companies?

4   A.   **Yes.**

5   Q.   And is that true?

6   A.   **As far as I know.**

7   Q.   You think it is more environmentally

8        friendly?

9   A.   **Yes.**

10  Q.   Is ProTech the only painting company that

11       follows environmental laws?

12  A.   **No.**

13  Q.   So why is ProTech more environmentally

14       friendly?

15  A.   **I can't say that we're more friendly.**

16            We comply with state and local laws

17       for removal of hazardous products.  Are

18       there other companies that do that?  Yes.

19  Q.   Is --

20  A.   **Are there other companies that don't do**

21       **that?  Yes.**

22  Q.   Which ones?

23  A.   **I'm sure who there are.  I couldn't name**

24       **names.**

65

1  Q.  Okay, JTC doesn't claim to be
2      environmentally friendly in its mailer, does
3      it?
4  A.  No.
5  Q.  It doesn't copy this bullet point at all?
6  A.  No.
7  Q.  The fourth bullet point on your mailer is
8      titled *"clean and courteous,"* correct?
9  A.  Correct.
10 Q.  Do you allege that JTC copied that bullet
11     point?
12 A.  Yes, it is identical.
13 Q.  The bullet point itself or the language
14     underneath it?
15 A.  The bullet point itself.
16 Q.  Did you come up with the idea of a painting
17     company being clean and courteous?
18 A.  Yes.
19 Q.  What concept are you trying to convey to the
20     potential customer by saying that ProTech is
21     clean and courteous?
22 A.  That we clean up the job site daily and in
23     full upon completion.
24          When we paint an interior job for a

66

1      customer, that we are careful with handling
2      things and clean up their rooms as best we
3      can that day.
4          We're essentially moving in with
5      them for a short period of time.  We work on
6      a job from start to finish so we are not
7      just starting, leaving, coming back in two
8      weeks and finishing the job.  We'll start it
9      and complete it.
10          And courteous, that we respect the
11     individual and the property that we're
12     working on.
13 Q.  In your first sentence under "*clean and
14     courteous*" you state *"Our staff works
15     swiftly and professionally."*  Do you allege
16     that JTC copied that sentence?
17 A.  They expanded on it, but it is very similar.
18 Q.  What parts did they copy?
19 A.  Well, without using -- because they use the
20     thesaurus, they could change *"swiftly"* to
21     *"quickly"* and *"professionally"* to
22     *'efficiently'*.  And *"start to finish to
23     ensure a timely completion"* to *"ensure a
24     timely completion of your project"* very

67

1      similar.
2  Q.  Are those novel concepts in the painting
3      industry *"working swiftly and
4      professionally"*?
5  A.  A novel concept?  No, it's not.
6  Q.  Were they novel at the time you created
7      them?
8  A.  Yes.
9  Q.  No other painting company proclaimed to be
10     *"swift and professional"* until you came up
11     with the idea?
12 A.  And *"clean and courteous,"* no.  Definitely
13     not in a direct mail piece.
14 Q.  Is there anything special about the way you
15     say that the way your staff works swiftly
16     and professionally?
17 A.  No.
18 Q.  Anything special about the way you say in
19     your mailer *"We work on your project from
20     start to finish to ensure a timely
21     completion without interruptions"*?
22 A.  Nothing special about it other than that it
23     is unique to a direct mail piece in the
24     paint contracting business.

68

1  Q.  Nationwide that is unique?
2  A.  Best of my knowledge.
3  Q.  How many mailers have you looked at
4      nationwide?
5  A.  A fair amount.
6  Q.  What would that be?
7  A.  25 or more.
8  Q.  Your last sentence under "*clean and
9      courteous,*" says, *"We also believe that our
10     efficiency is enhanced by our neatness and
11     cleanliness which makes the whole job turn
12     out better,"* do you allege that JTC copied
13     that line?
14 A.  It is not a direct copy.  It is paraphrased.
15 Q.  Where is it paraphrased?
16 A.  *"Jobs are cleaned daily.  Neatness and
17     cleanliness which makes a job turn out
18     better."*
19 Q.  Where are you reading from?
20 A.  *"Clean and courteous"* in the JTC bullet
21     compared to *"enhanced by our neatness and
22     cleanliness which makes the whole job turn
23     out better."  Job sites are cleaned daily
24     upon completion."*  It is paraphrased.

69

1    Q.    Do you have a cornerstone, in your opinion,
2          on those concepts being clean and courteous
3          as a painting company?
4    A.    **I don't understand your question.**
5    Q.    Do you believe that you own that phrase
6          *"clean and courteous,"* that no other
7          painting company can use it?
8    A.    **In referencing the residential house**
9          **painting business, I believe that we do.**
10   Q.    So, can another painting company, in your
11         mind, use the words *"clean and courteous,"*
12         or use similar words, or do they have to
13         stay away from the whole concept?
14   A.    **I think they should stay away from the whole**
15         **concept in a marketing piece soliciting**
16         **residential house painting.**
17   Q.    Would that be the same for *"full service,"*
18         your next bullet point?
19   A.    ***"Full service"* is a little more of a broad**
20         **term versus *"clean and courteous."***
21   Q.    Is that a common term for mailers in the
22         service industry?
23   A.    **Yes.**
24   Q.    And you didn't invent that term?

70

1    A.    **No.**
2    Q.    Is there anything under that bullet point
3          that you allege JTC copied?
4    A.    **No.**
5    Q.    Now, after we went through it again as you
6          sat here, do you still believe that the two
7          mailers, Exhibit No. 1 and Exhibit No. 6,
8          are nearly identical?
9    A.    **Yes, to the layperson,**
10   Q.    Well, I'm asking you what you think.
11   A.    **Yes.**
12   Q.    Other than what we talked about, is there
13         anything else that you think that JTC copied
14         from your mailer or which you can point to
15         as evidence of copying?
16   A.    **We've covered it.**
17         MR. WHITNEY:  Just off the record.
18         *(Discussion off the record.)*
19   Q.    Do you allege that JTC copied any of the
20         coloring of your brochure?
21   A.    **No.**
22   Q.    Do you understand what your claim to damages
23         would be for this case?
24         MS. CROW:  If you're confused ....

71

1    A.    **Explain that again, please.**
2    Q.    Well, you filed this lawsuit and what we're
3          litigating right now is the copyright
4          infringement claims.
5    A.    **Correct.**
6    Q.    You know the other claims are stayed at this
7          time.
8          Do you have an understanding what
9          you're claiming in damages for the copyright
10         infringement?
11   A.    **Yes.**
12   Q.    What are you claiming?
13   A.    **(Pause.)**
14   Q.    Just generally.  I'm not looking for a
15         number on this question.
16   A.    **We're requesting not loss of profits but**
17         **disgorgement.**
18   Q.    Disgorgement of JTC's profits?
19   A.    **Yes.**
20   Q.    And you are not claiming that JTC's alleged
21         copying of your mailer caused you to lose
22         profits in your business?
23   A.    **No.**
24   Q.    Aside from the fact that you are not

72

1          claiming it, do you think it caused you to
2          lose business?
3    A.    **Yes.**
4    Q.    How so?
5    A.    **JTC using a proven market tactic with an**
6          **employee who was a former franchisee for my**
7          **organization in the exact same towns,**
8          **mailing to the exact same people is a hit to**
9          **our business.**
10   Q.    What do you mean "to *the exact same people*"?
11   A.    **We're mailing to the same demographic base**
12         **that JTC would be mailing to.**
13   Q.    Where do you get your mailing lists?
14   A.    **We buy them from a variety of sources but in**
15         **most cases, it is Experian, which is a mail**
16         **list or a data list company.**
17   Q.    Do you know where JTC bought its mailing
18         list?
19   A.    **No.**
20   Q.    Do you know what geographic area JTC sent
21         its mailers out to?
22   A.    **Yes, I do.**
23   Q.    How do you know that?
24   A.    **We had found out that from Scott Estabrooks**

173

ERRATA SHEET

PLEASE ATTACH TO THE DEPOSITION OF
WAYNE A. SCHERGER, VOL. 1, 5-9-05
CASE:  WAYNE A. SCHERGER d/b/a
ProTech Painters vs. SCOTT ESTABROOKS
and JTC & COMPANY, INC.,

INSTRUCTIONS TO WITNESS:  1) Please note
desired corrections to your testimony by
page and line number.  2) Enter text as it
appears in the transcript.  3) Enter text as
it should appear.

PAGE      LINE          CORRECTION

11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24

---

174

## SIGNATURE PAGE

I, WAYNE A. SCHERGER, do hereby

certify that I have read the foregoing

transcript of my testimony, and further

certify that said transcript is a true and

accurate record of said testimony.

Signed under the pains and

penalties of perjury this ____ day of

_____, 2005.

_____

WAYNE A. SCHERGER

Subscribed and sworn to before me this

_____ day of _____ 2005.

_____

---

175

COMMONWEALTH OF MASSACHUSETTS
MIDDLESEX, ss.

I, Jill Kourafas, Certified
Shorthand Reporter and Notary Public duly
commissioned and qualified in and for the
Commonwealth of Massachusetts, do hereby
certify that:

On the 9th day of May 2005,
WAYNE A. SCHERGER, the witness whose
deposition is hereinbefore set forth was
duly sworn by me and identified by me with
photo ID, and that the foregoing transcript
is a true record of the testimony given by
such witness, to the best of my knowledge,
skill and ability.

I further certify that I am neither
attorney nor counsel for, nor related to or
employed by, any of the parties to the
action in which this deposition is taken,
and further that I am not a relative or
employee of any attorney or counsel employed
by the parties hereto or financially
interested in this action.

In Witness Whereof, I have hereunto
set my hand and affixed my seal this 11th
day of May, 2005.

_____
Notary Public
My Commission Expires:
February 26, 2006

THE FOREGOING CERTIFICATION OF THIS
TRANSCRIPT DOES NOT APPLY TO ANY
REPRODUCTION OF THE SAME IN ANY RESPECT
UNLESS UNDER THE DIRECT CONTROL AND/OR
DIRECTION OF THE CERTIFYING REPORTER.